**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

PAUMA BAND OF LUISENO MISSION
INDIANS OF THE PAUMA & YUIMA
RESERVATION, AKA Pauma Band of
Mission Indians, AKA Pauma
Luiseno Band of Mission Indians,
*Plaintiff-Appellee/*
*Cross-Appellant*,

v.

STATE OF CALIFORNIA; CALIFORNIA
GAMBLING CONTROL COMMISSION,
an agency of the State of California;
EDMUND G. BROWN, JR., as
Governor of the State of California,
*Defendants-Appellants/*
*Cross-Appellees*.

Nos. 14-56104
14-56105

D.C. Nos.
3:09-cv-01955-
CAB-MDD
3:09-cv-01955-
CAB-MDD

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the Southern District of California
Cathy Ann Bencivengo, District Judge, Presiding

Argued and Submitted
July 10, 2015—San Francisco, California

Filed October 26, 2015
Amended December 18, 2015

Before: Mary M. Schroeder and Richard C. Tallman,
Circuit Judges, and John A. Jarvey,[*] Chief District Judge.

Opinion by Judge Tallman;
Dissent by Chief District Judge Jarvey

## SUMMARY[**]

### Indian Law

The panel filed (1) an order amending its opinion and dissent and denying petitions for panel rehearing and rehearing en banc, and (2) an amended opinion and dissent in an action concerning a Tribal-State Gaming Compact.

In its amended opinion, the panel affirmed the district court's summary judgment and held that the Pauma Band of Luiseno Mission Indians was entitled to rescission of the 2004 Amendment to the 1999 Tribal-State Compact governing operation of Class III, or casino-style, gaming on Pauma's land.

The panel held that the interpretation of a Compact license pool provision in *Cachil Dehe Band of Wintun Indians of the Colusa Indian Cmty. v. Cal.*, 618 F.3d 1066 (9th Cir. 2010), applied, such that the State of California

---

[*] The Honorable John A. Jarvey, Chief United States District Judge for the Southern District of Iowa, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

would be deemed to have misrepresented a material fact as to how many gaming licenses were available when negotiating with Pauma to amend its Compact. The panel held that, unlike a change in judicial interpretation of a statute or law, the doctrine of retroactivity does not apply to contracts. Once there has been a final judicial interpretation of an ambiguous contract provision, that is and has always been the correct interpretation from the document's inception. The panel held that the district court properly granted summary judgment on Pauma's misrepresentation claim.

The panel held that the district court awarded the proper remedy to Pauma by refunding $36.2 million in overpayments, even though the district court mislabeled the remedy as specific performance, rather than rescission and restitution for a voidable contract. The panel held that this equitable remedy fell within the State's limited waiver of its sovereign immunity in the Compacts, and thus was not barred by the Eleventh Amendment.

On cross-appeal, the panel held that Pauma was not entitled to seek redress under the Indian Gaming Regulatory Act because the State and Pauma actually reached a gaming Compact.

Dissenting, Chief District Judge Jarvey wrote that the State did not commit the tort of misrepresentation by interpreting the Compact differently than a later court decision. He also wrote that, under the language of the Compact, the State did not waive its sovereign immunity with respect to this claim.

**COUNSEL**

Teresa Michelle Laird (argued), Deputy Attorney General; Kamala D. Harris, Attorney General of California; Sara J. Drake, Senior Assistant Attorney General; Neil D. Houston, Deputy Attorney General, San Diego, California, for Defendants-Appellants/Cross-Appellees.

Cheryl A. Williams (argued) and Kevin M. Cochrane, Williams & Cochrane, LLP, San Diego, California, for Plaintiff-Appellee/Cross-Appellant.

---

**ORDER**

The panel has voted to amend its previous opinion and issues the following opinion to replace it. With this amendment, the panel has voted to deny the petitions for panel rehearing and to deny the petitions for rehearing en banc.

The full court has been advised of the petitions for rehearing en banc and no judge has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35.

The petitions for panel rehearing and petitions for rehearing en banc are **DENIED**. No future petitions for rehearing or petitions for rehearing en banc will be entertained.

**OPINION**

TALLMAN, Circuit Judge:

Sixteen years ago more than sixty Native American tribes entered into Tribal-State Gaming Compacts with the State of California. Sadly, the long and tortured history leading to the culmination of these Compacts did not cease there. Rather, litigation based on ambiguous provisions as to the number of authorized gaming devices has ensued for most of the duration of these Compacts. *See In re Indian Gaming Related Cases*, 331 F.3d 1094, 1095–1107 (9th Cir. 2003) (detailing the entire history before and after the Compacts were enacted). Before us is yet another installment in this ongoing saga, this time between the Pauma Band of Luiseno Mission Indians ("Pauma" or "the Tribe") and the State of California, the California Gambling Control Commission, and Governor Edmund G. Brown, Jr. (collectively "the State").

Pauma sued the State based on our prior decision in *Cachil Dehe Band of Wintun Indians of the Colusa Indian Community v. California* ("*Colusa II*"), 618 F.3d 1066 (9th Cir. 2010). We have been asked to determine (1) whether *Colusa II*'s interpretation of the Compacts' license pool provision applies retroactively, such that the State would be deemed to have misrepresented a material fact as to how many gaming licenses were available when negotiating with Pauma to amend its Compact; (2) whether the district court awarded the proper remedy to Pauma by refunding $36.2 million in overpayments; and (3) whether the State has waived its sovereign immunity under the Eleventh Amendment. We answer each question in the affirmative, although on alternative grounds supporting the relief awarded by the district court with respect to the remedy. On cross-

appeal, Pauma also asks us to determine whether the State acted in bad faith under the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. § 2710.  We agree with the district court's finding that IGRA is inapplicable here, and thus Pauma's argument that the State acted in bad faith is irrelevant.

We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

# I

We begin our journey with a quick overview of the weathered past between Native American tribes and the State of California, and then discuss the complicated procedural history that leads us here.

# A

In 1988, Congress attempted to strike a delicate balance between the sovereignty of states and federally recognized Native American tribes by passing IGRA.  The purpose of IGRA is well established:

> IGRA was Congress' compromise solution to the difficult questions involving Indian gaming.  The Act was passed in order to provide "a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments" and "to shield [tribal gaming] from organized crime and other corrupting influences to ensure that the Indian tribe is the

> primary beneficiary of the gaming operation."
> 25 U.S.C. § 2702(1), (2). IGRA is an
> example of "cooperative federalism" in that it
> seeks to balance the competing sovereign
> interests of the federal government, state
> governments, and Indian tribes, by giving
> each a role in the regulatory scheme.

*Artichoke Joe's Cal. Grand Casino v. Norton*, 216 F. Supp.
2d 1084, 1092 (E.D. Cal. 2002), *aff'd*, 353 F.3d 712 (9th Cir.
2003). IGRA creates three classes of gaming, with Class III
gaming consisting of "the types of high-stakes games usually
associated with Nevada-style gambling." *In re Indian
Gaming*, 331 F.3d at 1097. As a result, Class III gaming is
subjected to the greatest degree of control under IGRA's
regulations. Class III gaming is lawful on Native American
lands only if such activities are conducted pursuant to a
Tribal-State Compact entered into by the tribe and a state that
permits such gaming, and the Compact is approved by the
Secretary of the Interior. *Id.* (citing 25 U.S.C. § 2710(d)(1),
(3)(B)).

California did not immediately allow Indian gaming
within its boundaries after the passage of IGRA. Some
gubernatorial administrations were hostile to tribes
conducting Class III gaming because it was then prohibited
by California's Constitution, and so the State refused to
negotiate with the tribes to permit it. *See id.* at 1098–99. In
1998, the people of California spoke by passing the tribes'
ballot initiative—Proposition 5 (codified at Cal. Gov't Code
§§ 98000–98012). *See Hotel Emps. & Rest. Emps. Int'l
Union v. Davis*, 21 Cal. 4th 585, 589 (1999). Proposition 5
contained a model compact purporting to effectuate IGRA's
provisions within California. *Id.* at 589–90. But the victory

was short-lived. The California Supreme Court found all but one sentence of Proposition 5 unconstitutional.[1] *Id.* at 589, 615. Undeterred, the voters of California responded by amending the California Constitution on March 7, 2000, to create an exception for certain types of Class III Indian gaming notwithstanding the general prohibition on gambling in the State. *In re Indian Gaming*, 331 F.3d at 1103 & n.11.

In September 1999, several tribes began negotiating with the State to enter nearly identical Compacts to operate Class III, or casino-style, gambling (the "1999 Compact"). In April 2000, Pauma joined more than sixty other tribes who ultimately signed the 1999 Compact. The 1999 Compact contains a provision limiting the number of licenses[2] available statewide for tribes based on a formula.[3] As we

---

[1] The sole surviving provision of Proposition 5 is the statutory waiver of sovereign immunity by the State for claims arising out of violations of IGRA. Cal. Gov't Code § 98005. The California Supreme Court found this provision severable and recognized that the language was meant to effectuate IGRA since the U.S. Supreme Court had recently stripped the Act of its teeth in *Seminole Tribe of Florida v. Florida*, 517 U.S. 44 (1996). *Hotel Emps.*, 21 Cal. 4th at 614–15; *see also Rincon Band of Luiseno Mission Indians v. Schwarzenegger*, 602 F.3d 1019, 1026 n.8 (9th Cir. 2010) ("California has waived its Eleventh Amendment immunity from such suits [brought by tribes under IGRA].").

[2] Each license is the equivalent of one slot machine or electronic video gaming device, and each tribe was limited to a maximum of 2,000 licenses.

[3] The formula, which has been the subject of much litigation, is found in section 4.3.2.2(a)(1) and reads:

> The maximum number of machines that all Compact Tribes in the aggregate may license pursuant to this Section shall be a sum equal to 350 multiplied by the

have previously observed, "[t]he License Pool Provisions that California and [the tribes] included in their Compact as a foundation for establishing Class III gaming in California are murky at best." *Colusa II*, 618 F.3d at 1084. Due to the limited time the tribes had to negotiate with the State, the parties agreed to the 1999 Compact without ever discussing their radically different interpretations of how many licenses the statewide license pool formula actually produced. *See id.* at 1070–72; *In re Indian Gaming*, 331 F.3d at 1104. It required protracted litigation before we settled the number in *Colusa II*, 618 F.3d at 1082.

By December 2003, the State informed the tribes that the collective license pool had been exhausted—without stating the total number of licenses actually authorized—and Pauma received only 200 licenses in that draw instead of its requested 750. Thus several tribes, including Pauma, began negotiating with the State to amend their Compacts in order to abolish the license pool provision and gain access to an unlimited number of licenses. The State demanded substantially more money per operable license during negotiations, *Rincon Band of Luiseno Mission Indians v. Schwarzenegger*, 602 F.3d 1019, 1025 (9th Cir. 2010), and only five tribes—including Pauma—ultimately concluded such amendments ("2004 Amendment"). *Colusa II*, 618 F.3d at 1072. At the time, Pauma was set to enter into a contract

---

number of Non-Compact tribes as of September 1, 1999, plus the difference between 350 and the lesser number authorized under Section 4.3.1.

Section 4.3.1 states tribes may not operate more gaming devices than "the larger of" "(a) A number of terminals equal to the number of Gaming Devices operated by the Tribe on September 1, 1999; or (b) Three hundred fifty (350) Gaming Devices."

with Caesars to build a Las Vegas-style casino in place of Pauma's tent facility near San Diego, but needed more gaming licenses to do so.[4]

Several lawsuits ensued. By 2009–2010, these suits had percolated in the district courts for several years, and culminated in dispositive opinions rendered by our court. *See Colusa II*, 618 F.3d at 1084; *Rincon*, 602 F.3d at 1026 (holding that the State negotiated in bad faith by refusing to remove a provision from the proposed 2004 Amendment for 15% of Rincon's net wins, which we declared an impermissible tax under IGRA). In *Colusa II*, we held that the State miscalculated the number of licenses in the common pool under the 1999 Compact. 618 F.3d at 1080. We found that the formula in the 1999 Compact allows for a statewide total of 40,201 licenses, not the 32,151 that the State had originally calculated. *Id.* at 1082.

---

[4] For more detail on the unsuccessful deal with Caesars, see *Pauma Band of Luiseno Mission Indians v. Harrah's Operating Co.*, No. D050667, 2009 WL 3069578 (Cal. Ct. App. Sept. 28, 2009). In summary, the Pauma and Rincon tribes are competitors whose casinos are only six miles apart in San Diego County. *Id.* at *2. The Rincon tribe had already paired with Harrah's in building a Nevada-style casino, and was operating 1600 licenses when their negotiations with the State broke down over the proposed 2004 amendments. Pauma intended to enter its contract with Caesars to compete with Rincon, but then Caesars and Harrah's merged in 2004. *Id.* Pauma knew the Rincon's exclusivity agreement with Harrah's would preclude it from building a competing casino and so Pauma backed out of the Caesars deal. *Id.* at *3–4. Pauma continued by negotiating with several other large gaming companies (Hardrock, Foxwood, etc.), but the economic recession of 2008 struck and no deal was ever completed. *Id.* Pauma has never been able to build a larger casino, and still operates its 1,050 licenses out of a tent facility.

**B**

Shortly after the district court in *Colusa* rendered its decision holding that more licenses existed than the State had allowed, Pauma filed a complaint asserting eighteen claims attacking the formation of the 2004 Amendment under various theories, including mistake and misrepresentation. Pauma notes that it has remained at roughly 1,050 licenses since December 2003 when the State first asserted that the license pool had been depleted, while two neighboring tribes operate at least 2,000 gaming devices apiece. Pauma executed the 2004 Amendment because it needed to have at least 2,000 licenses in order to secure a viable deal with a Las Vegas-style operator. But after the putative deals fell through, Pauma continued paying California the exorbitantly expensive 2004 Amendment prices for the same machines it acquired under the 1999 Compact provisions. Under the original 1999 Compact, Pauma paid $315,000 annually for the 1,050 machines. Under the 2004 Amendment, Pauma paid $7.75 million annually. Pauma sought reformation, injunctive relief, rescission, and restitution.

In April 2010, the United States District Court for the Southern District of California granted Pauma's request for injunctive relief from the annual $7.75 million payments, permitting Pauma to revert to the 1999 Compact rate. The State appealed. On the prior appeal, No. 10-55713, we left the injunction in place but remanded to the district court for reconsideration of the preliminary injunction factors in light of recent cases, including *Colusa II*. On remand, the case was reassigned to three different district judges before the court finally ruled on the summary judgment motions, leaving the injunction in place.

Presently before us is the district court's summary judgment ruling in favor of Pauma on its misrepresentation claim. In light of our ruling in *Colusa II*, the district court found the State had misrepresented the number of licenses available in December 2003 when it told Pauma the pool was exhausted; in fact, there were 8,050 remaining. As a result, the district court rescinded the 2004 Amendment, allowed Pauma to return to the 1999 Compact's lower rate, and ordered as specific performance a refund of the difference in payment that Pauma had made as between the higher and lower rates for the 1,050 machines (totaling $36,235,147.01). The district court also held that the State had waived its Eleventh Amendment sovereign immunity in a provision in the 1999 Compact, which the parties had left undisturbed in the 2004 Amendment. The court further held that the State was not entitled to a setoff for the profits Pauma made between 2004 and 2009 because Pauma should have been able to obtain the 1,050 machines under the correctly calculated license formula in the 1999 Compact.

The district court entered final judgment in December 2013, but was immediately asked by Pauma to vacate the order so it could request further relief. Pauma sought a ruling on two additional claims labeled "bad faith/violation of IGRA" so that the Tribe would be entitled to reformation rather than rescission. The district court denied the request as moot since it would not result in a remedy different from the one already provided to Pauma, and held it would fail on the merits in any event. This ruling triggered Pauma's mandamus petition, which we denied as premature earlier this

year.[5]  The State's appeal and Pauma's cross-appeal are now ripe for review.

## II

We review a district court's grant of summary judgment *de novo*.  *Big Lagoon Rancheria v. California*, 789 F.3d 947, 952 n.4 (9th Cir. 2015) (en banc).  "Summary judgment is appropriate if there is no genuine issue of material fact and, even making all reasonable inferences in favor of the nonmoving party, the moving party is entitled to judgment as a matter of law."  *Rincon*, 602 F.3d at 1026.  We also review the following legal determinations *de novo*: interpretation of contracts based on the plain meaning, *Colusa II*, 618 F.3d at 1070; whether negotiations were conducted in good faith under IGRA, *Rincon*, 602 F.3d at 1026; and the applicability of Eleventh Amendment sovereign immunity, *Idaho v. Coeur d'Alene Tribe*, 794 F.3d 1039, 1042 (9th Cir. 2015).  "General principles of federal contract law govern the Compacts, which were entered pursuant to IGRA."  *Colusa II*, 618 F.3d at 1073 (citation omitted).  We "often look to the . . . Restatement when deciding questions of federal common law."  *Curtin v. United Airlines, Inc.*, 275 F.3d 88, 93 n.6 (D.C. Cir. 2001).  We may also rely on California contract law since there is no practical difference between state and federal law in this area.  *Colusa II*, 618 F.3d at 1073.

---

[5] Pauma's mandamus petition essentially challenged the district court's decision to rule solely on its misrepresentation claim, and refusal to reach any of the other claims—such as the Tribe's bad faith claims under IGRA. We allowed Pauma to assert such claims in its cross-appeal, and Pauma has chosen to do so.  We address them below.

"We review the district court's choice of remedy for abuse of discretion." *Id.* at 1082. A misapplication of the correct legal rule constitutes an abuse of discretion. *United States v. Hinkson*, 585 F.3d 1247, 1261–62 (9th Cir. 2009) (en banc). Otherwise, we must "determine whether the trial court's application of the correct legal standard was (1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record." *Id.* at 1262 (internal quotations omitted).

## III

The heart of the State's argument before us focuses on whether there was a "fact in existence" that it misrepresented to Pauma during the 2004 negotiations. Thus, we review whether *Colusa II*'s holding that 40,201 licenses were available—meaning 8,050 remained in December 2003 when the State told Pauma that the license pool had been depleted—constitutes a "fact in existence" giving rise to liability under Pauma's misrepresentation claim. We hold that, unlike a change in judicial interpretation of a statute or law, the doctrine of retroactivity does not apply to contracts. Once there has been a final judicial interpretation of an ambiguous contract provision, that is and has always been the correct interpretation from the document's inception.

In order to establish its misrepresentation claim, Pauma must demonstrate: (1) the State made a misrepresentation about a fact in existence, (2) that was either fraudulent or material, (3) which induced Pauma to enter into the 2004 Amendment, and (4) Pauma was justified in relying on the State's misrepresentation. *See* Restatement (Second) of Contracts § 164(1) (1981); *see also Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1137 (9th Cir. 2000) (adopting the

Restatement definition for misrepresentation). The outcome of this case hinges on the first prong. "A misrepresentation is an assertion that is not in accord with the facts" as they exist at the time the assertion is made. Restatement (Second) of Contracts § 159 & cmt. c. "Such facts include past events as well as present circumstances but do not include future events. An assertion limited to future events . . . may be a basis of liability for breach of contract, but not of relief for misrepresentation." *Id.* § 159 cmt. c.

Furthermore, "an assertion need not be fraudulent to be a misrepresentation" so long as "it is material." *Id.* § 159 cmt. a; *cf. Reliance Fin. Corp. v. Miller*, 557 F.2d 674, 680 (9th Cir. 1977) (referring to this version as "innocent misrepresentation").[6] A misstated fact is "material if it would be likely to induce a reasonable person to manifest his [or her] assent" to enter a contract. Restatement (Second) of Contracts § 162(2). "A misrepresentation induces a party's manifestation of assent if it substantially contributes to his [or her] decision to" enter the contract. *Id.* § 167. Although a party must have justifiably relied upon the misrepresentation, "the requirement of justification is usually met unless, for example, the fact to which the misrepresentation relates is of

---

[6] We note that the district court had before it Pauma's claims for either innocent/material misrepresentation or fraudulent/negligent misrepresentation—and the court ruled for Pauma solely on the former. Thus, we refuse to consider any of Pauma's assertions that the State knowingly acted in bad faith or with any kind of evil intent. The formula was confusing. We definitively resolved the issue in 2010. Nothing in our decision in *Colusa II* suggests the State *should have known* the correct number of licenses when negotiating with Pauma in 2003–2004, and we refuse to so hold now. We review only whether innocent misrepresentation was properly applicable.

only peripheral importance to the transaction . . . ." *Id.* § 164 cmt. d.

While both parties dispute whether the doctrine of retroactivity applies, that doctrine is a red herring because we are dealing with a contract provision. The State argues that our holding in *Colusa II* does not apply "retroactively." In essence, the State asserts that the district court erred in granting summary judgment for Pauma because the license pool did not expand until mid-2009 when a district court first handed down its ruling in *Cachil Dehe Band of Wintun Indians of the Colusa Indian Community v. California* ("*Colusa I*"), 629 F. Supp. 2d 1091 (E.D. Cal. 2009). In the State's view, the number of available licenses changed when we handed down *Colusa II* in 2010. Thus, the State contends it could not have misrepresented an existing fact when it denied licenses to tribes beyond a total of 32,151. We reject this argument.

We find that the term "retroactive" is a misnomer in the realm of contract interpretation. Once a court has interpreted an ambiguous contract provision that is and has *always been* the correct interpretation from its formation. Although the cases discussing the retroactivity of judicial decisions interpreting statutes may be instructive, a contract is fundamentally different from a statute or a body of law. A contract is a private agreement formed between two parties to represent their mutual intent. *See* Restatement (Second) of Contracts § 3. Thus, a contract provision has only one true meaning—what it meant when written—even though the parties may later dispute the correct interpretation. By contrast, a statute is enacted by Congress and the

understanding of its provisions may evolve over time, often through judicial interpretations or legislative amendments.[7]

"[T]he fundamental goal of contract interpretation is to give effect to the mutual intent of the parties *as it existed at the time* of contracting." *U.S. Cellular Inv. Co. v. GTE Mobilnet, Inc.*, 281 F.3d 929, 934 (9th Cir. 2002) (emphasis added). This fundamental axiom is widely accepted and uncontested. *See, e.g.*, *Colusa II*, 618 F.3d at 1073 (holding the "court gives effect to the mutual intention of the parties *as it existed at the time* the contract was executed" (emphasis added) (internal quotations omitted)); *Liberty Nat'l Bank & Trust Co. v. Bank of Am. Nat'l Trust & Sav. Ass'n*, 218 F.2d 831, 840 (10th Cir. 1955) ("[T]he basic rule of universal acceptation for the ascertainment of [the parties] intention is for the court, so far as possible, to put itself in the place of the parties when their minds met upon the terms of the agreement . . . ."); 11 Williston on Contracts § 31:9 (4th ed. 2015).

When dealing with interpretation of a contract there is no such thing as a "change in the law"—once a final judicial decision determines what the contested language supports, that is it. The State's argument that *Colusa II* "changed" the number of licenses available under the license pool provision defies logic. As is typical in contract interpretation cases, the dispute was between the parties' competing calculations. Once we decreed that 40,201 licenses were available under the formula provision based on a reasonable interpretation of

---

[7] Therefore, the dissent's reliance on *Curtin v. United Airlines, Inc.* is misplaced as it involves the judicial interpretation of a provision of the Warsaw Convention; a legislatively enacted document, similar to a statute, rather than a contract. *See* 275 F.3d 88, 96–97 & nn. 16–20 (D.C. Cir. 2001).

the contract language and the intention of the parties at the time it was formed, we resolved the dispute.  *Colusa II*, 618 F.3d at 1081–82.  Thus, the number of licenses never "changed" as the State asserts.

In *Colusa II*, we found that the State did not adequately explain why it had chosen 32,151 for the total available licenses since "the foundation for this . . . number is at odds with the plain language of the contract and with an interpretation of part of the formula that is now agreed upon by both parties."  *Id.* at 1076; *see also id.* at 1078 nn. 9 & 12. We calculated the correct number of licenses that "were authorized for distribution statewide through the license draw process," to be 40,201, *id.* at 1082, and then we turned to the opinion's prospective effect on other tribes.  We recognized that "the remedy deprived the state of its right to litigate the size of the license pool under different facts in other pending and future cases" because we purposefully "anticipated that California would be liable for a single number of licenses in the statewide pool, *not separate numbers for separate litigants* based on their respective situations."  *Id.* at 1084 (emphasis added) (internal quotation marks omitted).  In sum, our interpretation in *Colusa II* of the 1999 Compact's license pool provision is the final word for all tribes, at all times.

The formula for calculating the license pool never changed—it just took over a decade to reach a final judicial interpretation which settled a longstanding dispute over the number of licenses it authorized.  Innocent misrepresentation of a different number does not require a fraudulent or misleading intent.  *See* Restatement (Second) of Contracts § 159 cmt. a.  It simply requires a fact, which is material, to be false.  *Id.* § 159 cmts. a, c.  The formula stated in the 1999 Compact is a fact.  The number of tribes with and without

Compacts as of the listed date (September 1, 1999) was an ascertainable, existing fact. *See Colusa II*, 618 F.3d at 1073. The number of licenses each tribe with a Compact had as of that date was also an existing fact. *Id.* at 1074. The State had all of the information it needed to calculate its own formula.[8] The State simply miscalculated.

Understandably, the State "expresses a sense of unfairness engendered by the retrospective application of a new judicial interpretation of an [existing contract provision]. But the essence of judicial decisionmaking necessarily involves some peril to individual expectations." *Morales-Izquierdo v. Dep't of Homeland Sec.*, 600 F.3d 1076, 1090 (9th Cir. 2010) (internal quotation and alterations omitted). The State could have sought a declaratory judgment much earlier, but it did not. The State also could have simply used fixed numerals in the formula, but it did not. The fact that there was ambiguity in the formula's language or that the State interpreted the total number of licenses in good faith is irrelevant to the analysis. We interpreted the total number of licenses in the license pool to be 40,201 based on a reasonable interpretation of the contract language. Therefore, in December 2003, the State misrepresented an existing fact to the tribes—including Pauma—that no further licenses were available when, in fact, there were 8,050 more licenses under the correct interpretation of the formula.

---

[8] "[I]t is undisputed that the State's negotiation team actually drafted [this provision] in the Compact." *Colusa I*, 629 F. Supp. 2d at 1115. As such, general contract principles also indicate that any ambiguity in "'the language of the contract should be interpreted strongly against the party who caused the uncertainty to exist' [(*i.e.*, the State drafters)]." *Id.* at 1113 (quoting *Buckley v. Terhune*, 441 F.3d 688, 695–96 (9th Cir. 2006)).

The State's remaining arguments regarding the misrepresentation claim warrant only brief discussion. First, the State's argument that the license pool provision was not material to the 1999 Compacts borders on the incredible. *See Colusa II*, 618 F.3d at 1069 ("Central to the Compacts is a formula to calculate the number of gaming devices California tribes are permitted to license."). Second, the State's argument that the limited number of licenses did not induce Pauma to enter the 2004 Amendment is equally absurd, considering procurement of more licenses (at least 2,000) was essential to its putative contract with Caesars, dependent on at least that many devices. Finally, Pauma justifiably relied on a fact that was entirely within the State's control (the total number of available licenses). Pauma has, therefore, established that no genuine issue of material fact remains as to its misrepresentation claim, and the district court properly granted summary judgment.[9]

## IV

After granting summary judgment in favor of Pauma on its innocent misrepresentation claim, the district court turned to the appropriate remedy. Since the Compacts include a limited waiver of sovereign immunity that allows for suit seeking an equitable remedy, but not one seeking monetary damages, we must first decide what the correct remedy is. Then we determine whether that remedy is barred by the

---

[9] We note that most tribes have already received their licenses under *Colusa II*, which approved the district court's remedy of re-opening the draw process for the remainder of the licenses. By contrast, Pauma is one of only five tribes who chose to amend its Compact and thus paid higher prices for licenses which it should have been able to obtain under the original 1999 Compact.

Eleventh Amendment or if it falls within the State's limited waiver.

## A

The district court erred in awarding Pauma $36.2 million under the guise of "specific performance." Specific performance is a remedy associated with breach of contract. Restatement (Second) of Contracts § 357; 81A C.J.S. *Specific Performance* § 4 (2015) ("[A] cause for specific performance ordinarily cannot lie until there has been a breach of the contract."). "A party who has avoided a contract on the ground of . . . misrepresentation . . . is entitled to restitution for any benefit that he has conferred on the other party by way of part performance or reliance." Restatement (Second) of Contracts § 376; 1 Witkin, Summary of California Law, Contracts § 1022 (10th ed. 2005) ("A person who pays money under the mistaken belief that he or she is under a duty to do so may recover it."). Furthermore, "[s]pecific performance . . . will not be granted unless the terms of the contract are sufficiently certain to provide a basis for an appropriate order." Restatement (Second) of Contracts § 362.

Where, as here, no breach of a contract has been alleged, but rather a challenge to its formation—*i.e.*, Pauma would not have entered into the 2004 Amendment had it known additional licenses were available at the cheaper 1999 Compact rates—the contract is voidable and the appropriate remedy is rescission and restitution. *See* 1 Witkin, Summary of California Law, Contracts § 307 (10th ed. 2005) (noting innocent misrepresentation is grounds for rescission); *see also Reliance Fin. Corp.*, 557 F.2d at 680 (same); Restatement (Third) of Restitution §§ 52, 54 (2011); Dan B. Dobbs, *Law of Remedies* § 4.1(1) (2d ed. 1993) ("When the contract itself

is unenforceable, restitution is usually the *only* remedy available for benefits the plaintiff has conferred upon a defendant in part performance." (emphasis in original)); *id.* § 9.2(2) ("A representation by the defendant, if believed by the plaintiff, would be the equivalent of a mutual mistake for which rescission would be granted."); *id.* § 9.3(1).

Moreover, one cannot specifically perform something that is not a term in the contract. *Cf.* Restatement (Second) of Contracts § 362. The Compact did not contain a clause for dealing with overpayments. The sole option for returning Pauma to the *status quo ante* was equitable restitution. *Id.* § 376; *see Ambassador Hotel Co. v. Wei-Chuan Inv.*, 189 F.3d 1017, 1031 (9th Cir. 1999). Thus, the district court misapplied the law in labeling the remedy specific performance.

However, in this case, the district court's error in mislabeling the remedy does not require reversal. Neither side disputes the calculation of $36,235,147.01 as the difference between the higher 2004 Amendment payments and the lower 1999 Compact's rates. Rather, the State challenges only whether it is entitled to a setoff for the profits Pauma gained from operating machines it would not have had absent the 2004 Amendment, and Pauma now alleges it is entitled to essentially reform the entire contract under the procedures outlined in IGRA. Since we reject both arguments, we affirm the district court's calculation of the remedy on the alternative grounds of equitable rescission and restitution.

Under general contract principles, "[w]hen calculating restitution, we must offset the Plaintiffs' award by the value of any benefits that Plaintiffs received from the [D]efendant

under the contract, so that only the actual, or net, loss is compensated." *Republic Sav. Bank, F.S.B. v. United States*, 584 F.3d 1369, 1377–78 (Fed. Cir. 2009) (internal quotation omitted); *see, e.g.*, *Cal. Fed. Bank v. Matreyek*, 8 Cal. App. 4th 125, 134 (1992) (holding restitutionary recovery inequitable where the bank would be able to retain both a benefit and a profit); Restatement (Second) of Contracts § 384; Dan B. Dobbs, *Law of Remedies* § 9.3(3) (2d ed. 1993). The State is not entitled to a setoff here because Pauma would have made the same profits by acquiring the same number of machines under the 1999 Compact that it now operates under the 2004 Amendment if the State had not miscalculated the number of available licenses.

The State argues that, although this would return Pauma to the *status quo ante* in theory, in reality it would unjustly enrich Pauma vis-à-vis the other tribes who were parties to the 1999 Compact because the other tribes were unable to obtain "unlimited" machines as Pauma could under the 2004 Amendment and thus did not earn additional profits. Essentially, the State argues that Pauma will receive a windfall of roughly $16 million by sitting on the sidelines during the *Colusa* litigation.

However, the State's argument depends on viewing the situation holistically, in contravention to general litigation principles. The district court correctly stated it must deal solely with the parties before it. *See, e.g.*, *Boating Indus. Ass'ns v. Marshall*, 601 F.2d 1376, 1382 n.7 (9th Cir. 1979) ("Remedy for this injury would depend upon actions of third parties not before the court in this action."). Under this view, as between Pauma and the State, Pauma is not obtaining a "windfall" because it should never have had to pay the State the $36.2 million in the first place, and it should have been

able to obtain the same number of licenses (a total of 1,050) for less money. Thus, the State's argument— to consider Pauma's position in comparison to the other tribes who were unable to obtain further licenses and the attendant profits—must fail. The district court correctly held that the State is not entitled to a setoff.

Pauma's argument for reformation meets a similar fate. On cross-appeal, Pauma requests reformation of the 2004 Amendment—rather than rescission—so that Pauma may keep the amended contract's extended term limit (expiring in 2030 instead of 2020) at the more favorable 1999 Compact price rates. "[H]owever, reformation is proper only in cases of fraud and [mutual] mistake." *Skinner v. Northop Grumman Ret. Plan B*, 673 F.3d 1162, 1166 (9th Cir. 2012); *see* Restatement (Second) of Contracts § 166 (referencing only fraudulent misrepresentation as giving rise to reformation as a remedy); Dan B. Dobbs, *Law of Remedies* § 9.5 (2d ed. 1993) ("Reformation is the appropriate remedy . . . for fraud or mistake in the written expression of the agreement."). This case involves *innocent* misrepresentation, not *fraudulent* misrepresentation. Reformation is thus inappropriate here.

In sum, the district court erred in applying the law of contractual remedies by awarding Pauma specific performance rather than ordering rescission and restitution. But because neither side challenges the calculation of the remedy, only whether a setoff should be applied or reformation ordered as a superior remedy— both of which we reject—we affirm the district court's award to Pauma of $36,235,147.01 under the equitable remedies of rescission and restitution.

**B**

Because the State must refund the $36.2 million in overpayments, we next consider whether the district court correctly held that the State had waived its Eleventh Amendment sovereign immunity in this case to permit such relief.

"[T]he rule has evolved that a suit by private parties seeking to impose a liability which must be paid from public funds in the state treasury is barred by the Eleventh Amendment." *Edelman v. Jordan*, 415 U.S. 651, 663 (1974). The Supreme Court has extended this bar to suits brought by Native American tribes even though they are sovereigns in their own right. *See Blatchford v. Native Vill. of Noatak*, 501 U.S. 775, 779–82 (1991). In *Edelman*, the Court made clear that a state's sovereign immunity extends even to equitable judgments, particularly if "the award resembles far more closely the monetary award against the State itself . . . than it does the prospective injunctive relief . . . ." 415 U.S. at 665. The Court specifically rejected an individual's claims for "equitable restitution" based on the state's wrongful withholding of benefits under a public aid program. *Id.* at 656, 665. Thus, the Court held only prospective, non-monetary relief against state officials is exempt from the Eleventh Amendment bar. *Id.* at 677.

"However, there are exceptions to this general bar." *N.E. Med. Servs., Inc. v. Cal. Dep't Health Care Servs.*, 712 F.3d 461, 466 (9th Cir. 2013). The Supreme Court discussed one such exception at length in *Edelman*—waiver. 415 U.S. at 671–74. *Edelman* recognized that Congress may abrogate a states' sovereign immunity via a clear, express legislative statement, or a state may enter a "compact" by which the state

expressly and unequivocally waives its own immunity. *Id.* at 672. "In deciding whether a State has waived its constitutional protection under the Eleventh Amendment, we will find waiver only where stated by the most express language or by such overwhelming implications from the text as will leave no room for any other reasonable construction." *Id.* at 673 (internal quotation and alteration omitted).

Here, the State waived its Eleventh Amendment sovereign immunity through an explicit contractual waiver. The 1999 Compact contains a limited waiver of sovereign immunity on behalf of both the State and the Tribe, which the 2004 Amendment left undisturbed. It reads in relevant part:

> Sec. 9.4. Limited Waiver of Sovereign Immunity.
>
> (a) In the event that a dispute is to be resolved in federal court . . . , the State and the Tribe expressly consent to be sued therein and waive any immunity therefrom that they may have provided that:
>
> (1) The dispute is limited solely to issues arising under this Gaming Compact;
>
> (2) Neither side makes any claim for monetary damages (that is, only injunctive, specific performance, including enforcement of a provision of this Compact requiring payment of money to one or another of the parties, or declaratory relief is sought); . . . .

This is an express waiver that falls within the exception to the Eleventh Amendment delineated in *Edelman*—but the parties dispute the scope of the waiver. We must determine whether the exclusion for monetary damages in Section 9.4(a)(2) includes authorization to seek the remedy of rescission and restitution.

We hold that the proper remedy here does not trigger the exclusion provision, and thus the State waived its sovereign immunity for Pauma's misrepresentation claim. We begin by analyzing the language of the contract itself. *See Colusa II*, 618 F.3d at 1073. The contractual language establishes a clear dichotomy between claims for monetary damages— which are excluded and thus barred by sovereign immunity—and equitable relief. Although restitution may be considered a legal or equitable remedy, *see* Restatement (Third) of Restitution § 4(1); Dan B. Dobbs, *Law of Remedies* § 4.1(1) (2d ed. 1993), interpreting the contract as a whole demonstrates that restitution was contemplated by the parties as a potential remedy for which sovereign immunity was waived. Thus, we hold that restitution is included in the waiver "by such overwhelming implications from the text as will leave no room for any other reasonable construction." *Edelman*, 415 U.S. at 673 (internal quotation and alteration omitted).[10]

---

[10] The district court relied, as Pauma does on appeal, on *Bowen v. Massachusetts*, 487 U.S. 879 (1988), for the distinction drawn between monetary damages awards (meant to compensate for an injury) and specific monetary relief (meant to reinstate one to his or her original position). *Id.* at 893. But *Bowen* simply reaffirms two steadfast principles: (1) equitable relief, which may take the form of money, is different than monetary damages; and (2) when Congress has specifically provided a waiver of sovereign immunity in a statute that allows for equitable relief (there, the Administrative Procedure Act ("APA")), that

"A written contract must be read as a whole and every part interpreted with reference to the whole, with preference given to reasonable interpretations." *Wapato Heritage, L.L.C. v. United States*, 637 F.3d 1033, 1039 (9th Cir. 2011) (internal quotation omitted); *see* Restatement (Second) of Contracts § 202(2). Here, reading the contract as a whole, the present restitutionary order falls well within the waiver.

The waiver applies "provided that . . . [n]either side makes any claim for monetary damages (that is, only injunctive, specific performance, *including enforcement of a provision of this Compact requiring payment of money to one or another of the parties* [which must mean either Pauma or the State], or declaratory relief is sought)." This clause envisions payment of money to *either* party, and yet the Compact does not contain any provisions requiring payment of money from the State to the Tribe.[11] If this clause did not

---

may occasionally involve specific relief in the form of money. However, those propositions do not answer the contractual interpretation question presented here.

We have already stated that *Bowen* does "not implicate Eleventh Amendment concerns" since it only analyzed the statutory language of the APA. *Native Vill. of Noatak v. Blatchford*, 38 F.3d 1505, 1513 (9th Cir. 1994). Furthermore, although *Bowen* cited approvingly contract cases awarding specific performance, those cases all dealt with a *breach* of contract issue and enforcement of a *contract provision* to pay money—neither of which exist in the present case. Consequently, *Bowen* sheds light on the current case only to the extent it reinforces our conclusion that restitution of the money wrongfully paid by Pauma may still be awarded as an equitable remedy and is not a claim for monetary damages against the State.

[11] The State itself asserts that no provision in the contract required it to pay Pauma money when arguing that specific performance was the wrong

contemplate the restitutionary remedy ordered by the district court and affirmed herein, then the provision would be operative only as to one party, not both. Excluding restitution as a remedy that the Tribe could seek under this waiver would render this clause null and void. *Cf.* 11 Williston on Contracts § 32:5 (4th ed. 2015) ("An interpretation which gives effect to all provisions of the contract is preferred to one which renders part of the writing superfluous, useless or inexplicable."). When "that is" is construed to limit waiver only as to the remedies listed, as urged by the dissent, the restitution remedy ordered by the district court still falls within that restrictive interpretation. Thus, the district court properly held that restitution by the State of overpayments by the Tribe was included in the waiver.

In sum, the contractual waiver clearly envisions restitution as falling within its purview, and only actions for monetary *damages* or actions not arising from the Compact itself to be excluded. The proper remedy for Pauma due to the State's misrepresentation of the number of licenses available under the 1999 Compact's formula is rescission of the 2004 Amendment and restitution for the overpayments made. Therefore, the State contractually waived to this extent its Eleventh Amendment sovereign immunity and Pauma was not barred from bringing its misrepresentation claim seeking rescission and restitution.[12]

---

remedy. That argument cuts against the State here given the language of the agreement.

[12] In any event, California—unlike many states—has chosen to legislatively enact a broad statutory waiver of sovereign immunity for claims arising out of violations of IGRA. *See* Cal. Gov't Code § 98005; *Hotel Emps.*, 21 Cal. 4th at 615. Because we find the contractual waiver to include the restitutionary remedy sought and recovered here, we need

## V

On cross-appeal, Pauma asserts the district court erred by denying summary judgment on the Tribe's fifth and sixth claims for relief—styled as bad faith/IGRA violation claims. Pauma provides a lengthy and fact-intensive explanation why it thinks the State acted in bad faith with respect to the entirety of their course of dealings over the last fifteen years. The Tribe relies heavily upon our recent decision in *Rincon*, involving a different California tribe, that upheld a finding of bad faith under IGRA. However, in the process, Pauma ignores the explicit statutory language of IGRA under which it seeks relief. The district court held Pauma's IGRA claims were moot because rescission of the 2004 Amendment had already been granted,[13] judicially estopped as inconsistent

_____

not reach whether the statutory waiver would also apply. We do note, however, that our ruling is supported by the California Supreme Court, which upheld the constitutionality of the waiver provision contained in the referendum by the people. *Hotel Emps.*, 21 Cal. 4th at 615.

[13] Neither of the parties briefed this issue so we need not reach it, but we also note the district court's analysis is supported by our recent en banc decision in *Big Lagoon Rancheria*, 789 F.3d at 955 (holding the tribe's cross-appeal was moot regarding bad faith claim since the district court had ruled in the tribe's favor on other grounds).

with Pauma's earlier position,[14] and barred by the plain language of the IGRA statute. We affirm on the last ground.

The plain language of IGRA does not support Pauma's argument. IGRA states that a Native American tribe "shall request" a state to enter into negotiations for the purposes of entering a Tribal-State Gaming Compact, and "[u]pon receiving such a request, the State *shall negotiate* with the Indian Tribe *in good faith* to enter into such a compact." 25 U.S.C. § 2710(d)(3)(A) (emphasis added). In order to give effect to this language, the statute vests federal district courts with jurisdiction over "any cause of action initiated by an Indian tribe arising from the failure of a State to enter into negotiations with the Indian tribe for the purpose of entering into a Tribal-State compact under paragraph (3) *or* to conduct

---

[14] Pauma's claims are not inconsistent, as the district court found. Although Pauma did not use the words "bad faith" in the body of its complaint with respect to these IGRA claims, it relied heavily on *Rincon*'s holding that the State's request for 15% of the tribe's net wins in its proposed 2004 Amendment was an impermissible tax under IGRA and that the State thus negotiated in bad faith when it refused to remove that provision. *Rincon*, 602 F.3d at 1024–25, 1036, 1042. We did not express an opinion as to the validity of the provision for the five tribes, including Pauma, who successfully negotiated and obtained a 2004 Amendment because their Compacts "were satisfactory to them" and the tribes freely entered into the amendments. *Id.* at 1037 n.17. Since Pauma had the same provision in its 2004 Amendment that was at issue in *Rincon*, Pauma argues that the same result should be applied in its case.

The district court also found that Pauma was requesting different relief, but in fact Pauma had been requesting "reformation" based on IGRA claims five and six in the complaint from the beginning. Pauma merely requested "rescission" and "restitution" in addition, with claim ten (misrepresentation) providing a basis for such relief. Thus, Pauma's claims in its complaint and summary judgment motion are not inconsistent.

such negotiations *in good faith*[.]"  *Id.* § 2710(d)(7)(A)(i) (emphasis added).

The next subsection describes, in detail, the procedure a tribe must follow if a state does not adhere to these mandates. *Id.* § 2710(d)(7)(B).  Specifically, the Native American tribe must first introduce evidence that "a Tribal-State compact *has not been entered into* under paragraph (3)," and "the State did not respond to the request of the Indian tribe to negotiate such a compact or did not respond to such request in good faith[.]" *Id.* § 2710(d)(7)(B)(ii)(I), (II) (emphasis added).  Then, IGRA provides a remedy if such an event should occur:  "If . . . the court finds that the State has failed to negotiate in good faith with the Indian tribe to conclude a Tribal-State compact governing the conduct of gaming activities, the court *shall order* the State and the Indian Tribe *to conclude such a compact* within a 60-day period."  *Id.* § 2710(d)(7)(B)(iii) (emphasis added).  This same section also lists factors a court may consider when determining whether a State has negotiated in good faith.  *Id.*

The detailed procedures set forth in IGRA allow for redress by Native American tribes when a State refuses to negotiate or negotiates in bad faith for a gaming Compact. These procedures, by their own language, simply do not apply when the State and the Tribe have *actually reached a Compact*.  *See id.* § 2710(d)(7)(B)(ii)(I).  *Rincon* does not hold otherwise.  *Cf.* 602 F.3d at 1026.  The Rincon tribe (Pauma's nearby competitor in San Diego) also entered into negotiations with the State in 2003 and 2004—but Rincon *refused to sign* an actual amended Compact with the State and filed suit instead.  *Id.* at 1023, 1026; *see also Big Lagoon Rancheria*, 789 F.3d at 951–52; *In re Indian Gaming*, 331 F.3d at 1110 (holding the State did not negotiate in bad

faith with respect to the 1999 Compact's revenue provisions, which the tribe refused to sign). Pauma is thus in a very different position than the Rincon tribe because it actually agreed to the 2004 Amendment and did not challenge the negotiation process under IGRA.

Therefore, the district court correctly concluded: "Although [ ] IGRA may allow a court to reform or rescind an unlawful agreement (which is what Pauma wanted until now), it does not allow the Court to turn back the clock and compel re-negotiation of an agreement actually reached ten years ago, let alone one that has been rescinded and never would have been negotiated in the first place in light of the relief the Court has already granted in this case." The relief Pauma seeks in its cross-appeal is not available under the plain statutory language of IGRA, and we affirm the district court's denial of Pauma's summary judgment motion on this ground.

## VI

In conclusion, we hold that once a court's judgment interpreting an ambiguous contract provision becomes final, that is and has always been the correct interpretation from its inception. As such, the State innocently misrepresented a material fact when it erroneously informed Pauma the 1999 Compact's license pool had been depleted based on its miscalculation of the formula. Since this misrepresentation induced Pauma to enter into the much more expensive 2004 Amendment, the Tribe is entitled to rescission of the amendment and restitution for the $36.2 million in overpayments made to the State. The Eleventh Amendment does not bar this suit because the State contractually waived its sovereign immunity for claims arising out of the Compacts

seeking such relief.  Finally, Pauma is not entitled on cross-appeal to seek redress under IGRA because the plain language of the statute precludes relief when the Tribe and the State actually enter into a Compact.[15]

**AFFIRMED.**  Each party shall bear its own costs.

JARVEY, Chief District Judge, dissenting:

I agree with the majority's conclusion that courts determine contracting parties' intent as of the time the contract is executed. I disagree, however, that California committed the tort of misrepresentation by interpreting the Compact differently than a later court decision.  The provision regarding the number of available licenses in the Compact was hopelessly ambiguous.  California, the compacting tribes, the district court and this court all interpreted it differently. That this court's opinion differed from that offered by California does not establish that California made "an assertion that [was] not in accord with the facts" as they existed at the time the assertion was made. RESTATEMENT (SECOND) OF CONTRACTS § 159 & cmt. c.

The decision in *Colusa II* was not the result of any judicial fact finding.  In fact, this court rejected the parties'

---

[15] Pauma makes conclusory references to the claims it advanced in its mandamus petition, asking the court to vacate the magistrate judge's order denying Pauma's motion to compel discovery and to reassign the case to a different district court judge based on her handling of the IGRA claims. We deny both of these requests as moot in light of our holding foreclosing further pursuit of Pauma's claims under IGRA.

extrinsic evidence for contract interpretation purposes and determined the number of available licenses as a matter of law. Because extrinsic evidence was rejected and the number determined as a matter of law, all parties to the Compact were on equal footing with respect to their ability to interpret this ambiguous provision. The majority is correct when it notes that any party could have sued to get more clarity. The tribes in *Colusa II* did, but the plaintiff here chose instead to negotiate for the possibility of receiving more licenses than have ever been available under the 1999 Compact.[1]

On the misrepresentation issue, *Curtin v. United Airlines, Inc.*, 275 F.3d 88 (D.C. Cir. 2001) is analogous and persuasive. *Curtin* involved a provision of the Warsaw Convention (a treaty) that established the compensation to be paid by a carrier when passengers' luggage was lost during international travel. The Warsaw Convention provided for a payment of $9.07 per pound up to the maximum of a seventy pound bag, or $635. United Airlines had a practice of paying the maximum amount ($635) for lost international luggage rather than weighing the bags and paying the $9.07 price per pound for the lost luggage. That practice had been interpreted by some courts as permissible, and by others as impermissible. Ultimately, the District of Columbia Circuit Court of Appeals rejected the practice, holding that the Warsaw Convention did not cap liability at $635 where the carrier had failed to weigh the bags as required.

In *Curtin*, passengers who had settled their lost luggage claims for $635 sued claiming, among other things, that the

---

[1] I find it more than ironic that Pauma has received monetary damages as a result of *Colusa II* that were denied to the tribes that won that decision. I find it inequitable.

settlement agreements were procured by United's misrepresentation of its obligation under the Warsaw Convention, as later determined by the Court of Appeals. However, the District of Columbia Circuit held that United did not make a misrepresentation by reasonably interpreting the Warsaw Convention differently than the later District of Columbia Court of Appeals decision. This decision is sensible, intuitive and analogous to what happened in the matter now before the court. Because I believe that the State's interpretation of this ambiguous contractual provision does not qualify under the common law definition of a material misrepresentation, I respectfully dissent.

I also do not believe that the State of California waived sovereign immunity with respect to this claim. The 1999 Compact waives immunity as follows:

> Sec. 9.4. Limited Waiver of Sovereign Immunity.
>
> (a) In the event that a dispute is to be resolved in federal court . . . , the State and the Tribe expressly consent to be sued therein and waive any immunity therefrom that they may have provided that:
>
> (1) The dispute is limited solely to issues arising under this Gaming Compact;
>
> (2) Neither side makes any claim for monetary damages (that is, only injunctive, specific performance, including enforcement of a provision of this Compact requiring

payment of money to one or another of the
parties, or declaratory relief is sought); . . . .

I agree with the majority that the remedy of specific
performance is not available in this case. The majority
upholds the award as restitution, concluding that the Compact
waives immunity against claims for restitution because the
Compact waives immunity against claims for "specific
performance, including payment of money to one or another
of the parties." I disagree with the majority's reading of the
waiver.

The limited waiver of sovereign immunity is well drafted
and clear. It states that neither side can make a claim for
monetary damages. It then defines the waiver, beginning
with the words "that is." The phrase "that is" is commonly
thought of as a shorthand version of the phrase "that is to
say." It is used to preface a more specific delineation of the
preceding contractual language. Here, to further clarify the
limitation of the waiver, the parties stated, "that is, *only*
injunctive, specific performance, including enforcement of a
provision of this Compact requiring payment of money to one
or another of the parties, or declaratory relief is sought . . . ."
(emphasis added). The use of the word "only" is routinely
defined to mean alone, solely or exclusively. The waiver's
applicability is therefore explicitly confined to the
circumstances listed.

The majority infers a waiver of sovereign immunity for
restitution from a canon of contract interpretation that prefers
interpretations that do not render other terms "superfluous,
useless or inexplicable." It finds that reading the language
"including payment of money to *one or another* of the
parties" as allowing monetary payment only in the context of

specific performance would render the clause superfluous because the Compact's  payment provisions run only from Pauma to the State.  But this reading disregards the explicit text of the clause.  The clause makes clear that the parties intended "specific performance" to include monetary payments only when the Compact requires them. This language is the parties' clear recognition of *Bowen v. Massachusetts*, 487 U.S. 879 (1988), which held that a monetary payment can constitute specific performance when a contractual clause requires such payment.  The fact that the waiver includes specific performance of payment provisions does not render it superfluous,  useless or inexplicable simply because those particular obligations run only from Pauma to the State.  It would be helpful in the event of that kind of breach by Pauma.

The monetary damages awarded here do not qualify as injunctive, specific performance or declaratory relief. Because the law demands that waivers of sovereign immunity ordinarily derive only from "the most express language" or "such overwhelming implications from the text as [will] leave no room for any other reasonable construction," there can be no waiver found here. *Edelman v. Jordan*, 415 U.S. 651, 673 (1974) (citation and internal quotation marks omitted) (alteration in original).   The express language of the sovereign immunity does not include suits for restitution, and in fact, explicitly excludes suits for monetary damages outside the context of specific performance.  I find no other implications from the text, and certainly not overwhelming implications, of sovereign immunity waiver.